# In the United States Court of Federal Claims

BID PROTEST

No. 17-1080C

(Filed Under Seal: November 2, 2017 | Reissued: November 17, 2017)[*]

|  |  |
|---|---|
| XPO LOGISTICS WORLDWIDE GOVERNMENT SERVICES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant, <br><br> and <br><br> CROWLEY LOGISTICS, INC., <br><br> Defendant-Intervenor. | Keywords: Bid Protest; Motion for Judgment on the Administrative Record; Discussions; Past Performance; Corrective Action. |

*Frederick W. Claybrook, Jr.*, Claybrook LLC, Washington, DC, for Plaintiff. *Daniel R. Forman*, *Mark A. Ries*, *James G. Peyster*, and *Charles Baek*, Crowell & Moring LLP, Washington, DC, Of Counsel.

*Christopher L. Harlow*, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Patricia M. McCarthy*, Assistant Director *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant. *Robert D. Bowers*, *Willie J. McAlister*, and *Peter B. Ries*, Attorney-Advisors, Office of the Staff Judge Advocate, United States Transportation Command, Of Counsel.

*Kara M. Sacilotto*, Wiley Rein LLP, Washington, DC, for Defendant-Intervenor. *Rand L. Allen*, *Brian G. Walsh*, *Gary S. Ward*, *Cara L. Lasley*, Wiley Rein LLP, Of Counsel.

---

[*] This Opinion was originally issued under seal on November 2, 2017, and the parties were given the opportunity to request redactions. In light of the suggested redactions, the Opinion is now reissued, with redactions of potentially sensitive information indicated by brackets.

**OPINION AND ORDER**

**KAPLAN, Judge.**

This bid protest arises out of the award of a transportation services contract to Defendant-Intervenor Crowley Logistics, Inc. The Department of Defense, through the United States Transportation Command (USTRANSCOM or "the agency"), awarded the contract to Crowley after taking corrective action recommended by the Government Accountability Office (GAO). The agency took the GAO-recommended corrective action after this Court rejected bid protests filed by Crowley and by Plaintiff XPO Logistics Worldwide Government Services, LLC (XPO), in which each of them had objected to the proposed corrective action on various grounds. See XPO Logistics Worldwide Gov't Servs., LLC v. United States (XPO I), 133 Fed. Cl. 162, appeal docketed, No. 17-2506 (Fed. Cir. Aug. 30, 2017).

In the present case, XPO has filed a protest of the award to Crowley that followed the corrective action. In its complaint, XPO reasserts certain arguments that this Court rejected in XPO I. It also contends, among other things, that the agency engaged in misleading and unequal discussions with XPO regarding XPO's past performance and that the agency's decision to downgrade XPO's confidence assessment rating from "Substantial" to "Satisfactory" when it undertook its corrective action was arbitrary, capricious, and contrary to law.

Currently before the Court are the parties' cross-motions for judgment on the administrative record, as well as XPO's motion to supplement the administrative record. For the reasons discussed below, XPO's motion to supplement the administrative record and its motion for judgment on the administrative record are **DENIED**. The government's and Crowley's motions for judgment on the administrative record are **GRANTED**.

**BACKGROUND**

**I.      The Solicitation and Previous Protests**

The background of this solicitation and the subsequent bid protests was set forth in detail in the Court's opinion in XPO I. See 133 Fed. Cl. at 167–76. To briefly recap, USTRANSCOM is a combatant command that provides support to the other United States combatant commands, the military services, defense agencies, and other government organizations. Admin. R. (AR) Tab 6 at 151. On March 25, 2015, it issued a solicitation seeking proposals for an indefinite-delivery, indefinite-quantity contract to provide transportation coordination services throughout the continental United States as well as in Alaska and Canada, in connection with the Department of Defense Freight Transportation Services (DFTS) program. Id. at 87, 150. The winning offeror would be required to provide these services to both the Defense Logistics Agency and the Defense Contract Management Agency. Id. at 152. In addition, USTRANSCOM anticipated that other government agencies would join the DFTS contract over its lifetime. See id. The contract would have a two-year base period and five one-year option periods. Id. at 89–96.

The agency initially awarded the DFTS contract to GENCO Infrastructure Solutions, Inc. on December 30, 2015. Id. Tab 57 at 11060; id. Tab 58 at 11061. Both XPO and Crowley

protested the award before GAO, and GAO ultimately sustained Crowley's protest. See id. Tabs 67, 74. USTRANSCOM then reopened the competition and announced that it would hold discussions with all offerors in the competitive range and would allow offerors to submit revised proposals. See id. Tab 88 at 11982. GENCO withdrew following the reopening of the competition, but both Crowley and XPO participated in discussions and submitted revised proposals. See id. Tab 116 at 12273; id. Tab 120 at 12442–43.

The agency evaluated the revised proposals and awarded the contract to Crowley on November 22, 2016. See id. Tab 120 at 12442; see also id. Tabs 121–22. XPO then filed a bid protest with GAO. Id. Tab 126. On March 14, 2017, GAO sustained XPO's protest in part, agreeing that the agency's determination that Crowley's past performance references should be rated "Somewhat Relevant" was flawed. See id. Tab 148 at 13003–04.[1] As explained in greater detail in XPO I, GAO found: 1) that "it [was] not clear from the contemporaneous record how the agency determined that the magnitude of Crowley's past efforts supported the ratings of somewhat relevant," id. at 13013–14; and 2) that in any event, "the agency's selection of only the relatively low-value base period of the contract as awarded to Crowley unreasonably distort[ed] the comparison of the magnitude of Crowley's past efforts to the magnitude of the solicitation," id. at 13012; see also XPO I, 133 Fed. Cl. at 174–75. Accordingly, GAO recommended that USTRANSCOM "reevaluate Crowley's past performance in a manner that is reasonable and consistent with both the solicitation and [GAO's] decision, and then make a new source selection determination." AR Tab 148 at 13017.

## II.   The Court's Previous Decision

Shortly after GAO issued its decision, the contracting officer announced that USTRANSCOM would follow GAO's recommendation and take corrective action. Id. Tab 176 at 15860. Both XPO and Crowley then filed bid protests in this Court challenging the proposed corrective action.

On June 30, 2017, this Court issued its decision, rejecting both Crowley's and XPO's protests. The Court held that GAO's decision was rational, and that USTRANSCOM's decision to take corrective action in accordance with GAO's recommendation was therefore reasonable. XPO I, 133 Fed. Cl. at 179–80. In particular, the Court concluded that GAO's decision and recommendation that USTRANSCOM take corrective action were rational because the record did not reflect what factors the agency relied upon when it rated sixteen of Crowley's past performance references Somewhat Relevant. Id. at 179. The Court also agreed that the agency's proffered explanation before GAO, that the agency compared the dollar value of Crowley's past references to the value of the two-year base period of the DFTS contract, was not reasonable

---

[1] The solicitation provided four possible relevancy ratings for past performance references: Very Relevant, meaning that the "effort involved essentially the same scope and magnitude of effort and complexities th[e] solicitation requires"; Relevant, meaning the "effort involved similar scope and magnitude of effort and complexities"; Somewhat Relevant, meaning the "effort involved some of the scope and magnitude of effort and complexities"; and Not Relevant, meaning the "effort involved little or none of the scope and magnitude of effort and complexities." AR Tab 20 at 9501.

because the five option years were significantly higher in value and performing the options was part of the "efforts" the "solicitation requires." Id. at 179–80.

With respect to XPO's challenges to the agency's corrective action, the Court found that USTRANSCOM followed the requirements of the FAR for assessing unbalanced pricing by comparing the prices received in response to the solicitation. Id. at 182. It also rejected both XPO's assertion that the solicitation required the agency to consider some other, undefined concept of price beyond the total evaluated price and its argument that the agency changed its consideration of price between the first and second evaluations. Id. at 182–84. Finally, the Court rejected as contrary to the evidence in the record XPO's claim that the agency did not look beyond adjectival ratings in assessing the proposals. Id. at 185–86.

Thereafter, on July 3, 2017, the contracting officer informed both XPO and Crowley that "USTRANSCOM [was] taking corrective action in accord with [the] GAO decision." See AR Tab 194 at 16556–58; id. Tab 195 at 16559. He also informed the parties that "discussions [were] closed and nothing [was] required to be submitted." Id. Tab 194 at 16556.

## III.   USTRANSCOM's Re-Evaluation of Past Performance

### A.   Standards Applied

In the meantime, on April 11, 2017, after GAO issued its recommendation but before the Court issued its decision, USTRANSCOM's Past Performance Evaluation Team (PPET) completed a new analysis of the past performance references supplied by both XPO and Crowley. Id. Tab 192 at 16352–95. The PPET noted that each past performance "effort was evaluated independently to determine recency and relevancy." Id. at 16352. It further explained that "determination[s] of relevancy [were] made on the evaluation of scope and magnitude of effort and complexities this solicitation requires for each evaluated past performance effort." Id.

With respect to the "magnitude" of past performance efforts, the PPET stated that it "compared the Value Per Year Equivalency of each past performance effort to the average value of transportation CLINS for each year of performance (including options) of the DFTS contract, which equates to $370,166,666.67." Id. at 16352–53. It also compared "the monthly number of shipments for each past performance effort to the projected 20,000 monthly shipments to be performed under the DFTS contract." Id. at 16353. In addressing the "complexity" factor, the PPET stated that it had examined whether an offeror's past performance efforts included tasks similar in complexity to the DFTS program.[2] Id.

---

[2] The tasks identified included "supporting multiple agencies; the use of numerous shipping systems; three tiers of pricing based on response and pickup times; the requirement to support unit moves, FEMA shipments, and Foreign Military Sales shipments; the requirement to conduct customs brokerage services; and utilization of specialized equipment such as flatbeds, lowboys, stepdecks, goosenecks, and reefer vans." AR Tab 192 at 16353.

### B.     Reevaluation of XPO's Past Performance

### 1.     The Defense Transportation Coordination Initiative Contract

The PPET first addressed XPO's work on the predecessor program to DFTS, the Defense Transportation Coordination Initiative (DTCI). The DTCI effort (which was one of [***] past performance references that XPO submitted) had been rated as Very Relevant during prior stages of the procurement. Id. at 16353–54.

In the new evaluation, the PPET remarked that the DTCI reference was recent (in fact, contract performance was ongoing) and that XPO had been assigned "exceptional" and "very good" quality ratings on the contract. Id. at 16353. It found, however, that the DTCI contract requirements differed from the DFTS requirements in scope and complexity. Specifically, the PPET noted that the DFTS contract, but not the DTCI contract, included "Time Definite Delivery, three tiers of pricing, shipping into Canada and the potential of shipping into Alaska, on-ramp[ing of] other federal government agencies outside of the DoD, and customs brokerage services." Id. Therefore, it found that the requirements of the DTCI contract were "similar, but not essentially the same as the DFTS requirement." Id.

The PPET also compared the "magnitude" of the DTCI contract—i.e., its dollar value and volume of shipments—with the magnitude of the DFTS requirements. It calculated the "value per year equivalency" of the DTCI contract as [***], which it stated was approximately [***]% of the average annual value of the DFTS contract.[3] Id. at 16354. It further found that under the DTCI contract, XPO had been coordinating [***] shipments per month, which was [***]% of the number of shipments estimated under the DFTS contract. Id.

Based on the foregoing, the PPET concluded that the DTCI contract "involv[es] similar scope and magnitude of effort and complexities [to what] th[e] solicitation requires." Id. It therefore rated the DTCI reference as Relevant. Id.

### 2.     The [***] Contract

XPO's [***] remaining past performance efforts, [***] of which had been rated as Relevant during the prior stages of the procurement, were each found Not Relevant by the PPET during the corrective action reevaluation. The PPET concluded that none of the [***] contracts involved any of the complexities of effort required by the solicitation. Id. at 16354–55. In this

---

[3] XPO asserts, and the government and Crowley appear to concede, that the agency committed a computational error when it determined the average annual value of the DFTS contract because it divided the total contract value by six years, rather than seven. See XPO's Br. in Supp. of Its Mot. for J. on the Admin. R. (XPO's Br.) at 24–25, ECF No. 30-1; Def.'s Cross-Mot. for J. on the Admin. R. & Opp'n to Pl.'s Mot. for J. on the Admin. R. (Def.'s Mot.) at 18–19, ECF No. 35; Crowley's Mem. in Supp. of Its Cross-Mot. for J. on the Admin. R. (Crowley's Mem.) at 28–29, ECF No. 36-2. As XPO points out, when seven is used as a divisor, the value per year equivalency of the DTCI contract would be approximately [***]% of the annual value of the DFTS contract, rather than [***]%. See XPO's Br. at 25.

protest, XPO challenges the Not Relevant ratings assigned to its past contracts with [***] and [***].

The PPET concluded that XPO's [***] performance reference was recent. It also noted that in the past performance questionnaire, [***] had assigned XPO two "Marginal" quality ratings, three "Satisfactory" quality ratings, and one "Very Good" quality rating, but that [***] had stated that XPO "has made improvements" and that the areas to which the marginal ratings applied were "not considered a concern regarding future performance." Id. at 16354.

The PPET turned next to an assessment of the scope and complexity of the [***] contract. It observed that the contract did not include work involving "on time pick-up of freight, on time delivery of freight, and availability of equipment, to include specialized equipment," and thus it only "involved some of the scope of the requirement" and "little or none of the complexities of the DFTS effort." Id.

Turning to the magnitude of effort, the PPET calculated a value per year equivalency for the [***] effort of [***], or [***]% of the value per year of the DFTS contract.[4] Id. It noted, however, that the [***] monthly shipments under the [***] contract were [***]% of the number of monthly shipments expected under DFTS. Id.

Nevertheless, the PPET found that "[w]hile the number of shipments [***] what is anticipated . . . the dollar magnitude of the effort is minimal compared to the average value of transportation CLINS of the DFTS contract." Id. Thus, the team concluded that the [***] contract "involv[ed] some of the scope and magnitude of the effort," but "little or none [of its] complexities," and the PPET "therefore rated [the [***] contract] as **Not Relevant**." Id. (emphasis in original).

### 3. The [***] Contract

The PPET found the [***] contract recent and determined that its value per year equivalency was [***]. Id. It noted that the contract's annual value was [***]% of the average value of DFTS, but that the [***] contract's monthly shipments amounted to [***]% of the magnitude of shipments under DFTS.[5] Id. at 16355. As with the [***] contract, the team concluded that although the number of shipments exceeded what was expected under DFTS, "the dollar magnitude of the effort is minimal compared to the average value of transportation CLINS of the DFTS contract." Id.

The agency had not received a past performance questionnaire from [***], but requested specific information from it. According to [***], XPO was "the lead logistics provider managing [***]'s inbound transportation network to [***]'s North American production facilities," whose shipments included automotive parts for trucks and buses. Id. The PPET concluded that the "reference demonstrates little or none of the complexities of the DFTS effort reflected in

---

[4] This value per year equivalency is subject to the same apparent error as noted above. See n.3, supra.

[5] See n.4, supra.

paragraph I.E. above," i.e., it did not involve supporting multiple agencies, the use of numerous shipping systems, three tiers of pricing, and other complexities of the DFTS contract. Id. It concluded therefore that "this reference . . . involv[ed] some of the scope and magnitude of the effort" but "little or none [of its] complexities and [was] therefore rated as **Not Relevant**." Id. (emphasis in original).[6]

### 4. Confidence Assessment Rating

The PPET then summarized its analysis of XPO's efforts and assigned a confidence assessment rating.[7] It noted that it had "reviewed [***] past performance references which demonstrated a broad range of performance ratings from Marginal to Exceptional." Id. The team observed that XPO received four Exceptional ratings, seven Very Good ratings, three Satisfactory ratings, and two Marginal ratings in its past performance questionnaires. Id. at 16356. It then concluded that "[o]ne effort was rated as Relevant and the other [***] were rated as Not Relev[a]nt." Id. "Considering the relevancy of the references and the associated performance ratings," the agency then assigned XPO "an overall Confidence Assessment Rating of **Satisfactory Confidence**; meaning, based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort." Id. (emphasis in original).

### C. Reevaluation of Crowley's Past Performance

As noted, prior to GAO's recommendation that the agency take corrective action it had rated a number of Crowley's past performance references Somewhat Relevant. It had not, however, provided a sufficient justification for that conclusion. In taking corrective action, the PPET examined in some detail fifty-six different past performance references, this time finding each of them Not Relevant. Id. at 16358–88. The PPET report also listed over 150 additional past performance references provided by Crowley for which the government either did not receive past performance questionnaires, did not raise the references in evaluation notices, or did not solicit additional information from the references. Id. at 16388–93. Each of these efforts was also found Not Relevant. Id.

The PPET concluded that "[a]lthough Crowley has demonstrated corporate experience with this type of work and it has performed considerably well across the efforts it performed, all past performance references were determined Not Relevant, or could not be validated or determined recent. As such, Crowley's recent/relevant performance record is so sparse that no

---

[6] The narrative also contains a seemingly contradictory and incomplete sentence which asserts that information received from [***] "verified [that] the effort consists of some of the scope and complexity of the DFTS requirement, but not similar." AR Tab 192 at 16355. The parties do not address the meaning of this language and the Court concludes that it should be disregarded as it is inconsistent with the remainder of the paragraph.

[7] The solicitation included five possible confidence assessment ratings: Substantial Confidence, Satisfactory Confidence, Limited Confidence, No Confidence, and Unknown Confidence. AR Tab 20 at 9501–02.

meaningful confidence assessment rating can be reasonably assigned. Crowley is rated as **Unknown Confidence (Neutral)**." Id. at 16395 (emphasis in original).

## IV.    The New Source Selection Evaluation Board Report

On July 11, 2017, after the Court issued its decision in the prior bid protest, the Source Selection Evaluation Board (SSEB) issued a new report. Id. Tab 196 at 16560–619. It noted that it was following "GAO's recommendation to reevaluate Crowley's past performance," and that, "in addition, to ensure equal treatment, the contracting officer decided to reevaluate both Offerors['] past performance." Id. at 16571; see also id. at 16610–11. The SSEB reported that "[i]t was determined unnecessary to re-open discussions" and that "no proposal revisions were requested, nor received." Id. at 16571. Additionally, it stated that "[t]he only factor re-evaluated was Factor 4, Past Performance." Id.

The SSEB described its reevaluation as a "comprehensive review of each past performance effort to determine recency and relevancy." Id. at 16611. It referred to and relied upon the PPET's April 2017 past performance analysis discussed above, stating that "[t]he Past Performance Summary dated 11 April 2017 details the scope, magnitude, and complexity of each past performance reference." Id. Additionally, it noted that "[t]he determination of relevancy was made on the evaluation of scope and magnitude of effort and complexities th[e] solicitation requires." Id.

The reevaluation, the SSEB noted, resulted in "both remaining Offerors' confidence assessment ratings [being] impacted." Id. The results were as follows:

| Offeror | Corporate Experience | Business Proposal - Proposal Compliance/ SB Sub Plan | Technical Subfactor 1 /Risk | Technical Subfactor 2 /Risk | Technical Subfactor 3 /Risk | Technical Subfactor 4 /Risk | Past Performance | Total Evaluated Price (TEP) |
|---|---|---|---|---|---|---|---|---|
| Crowley | Acceptable | Acceptable/ Acceptable | Good/ Low | Good/ Moderate | Good/ Low | Good/Low | Unknown Confidence (Neutral) | $7,116,365,688 |
| Menlo | Acceptable | Acceptable/ Acceptable | Good/ Low | Good/ Low | Good/ Low | Good/Low | Satisfactory Confidence | $7,741,505,204 |

Id.[8]

Whereas the agency previously assigned Crowley a rating of Satisfactory Confidence, id. Tab 119 at 12441, the SSEB noted that the new rating was Unknown Confidence (Neutral), id. Tab 196 at 16611. Similarly, whereas XPO previously had a confidence assessment rating of Substantial Confidence, id. Tab 118 at 12398, the SSEB had now assigned it a rating of Satisfactory Confidence, id. Tab 196 at 16611. For Crowley, the SSEB noted that all of its 217 references were determined Not Relevant. Id. Although the SSEB concluded that some of Crowley's recent references had "some of the scope . . . the effort requires," others had "little or none of the scope the effort requires." Id. Tab 196 at 16611. Further, all of Crowley's references

---

[8] The SSEB's reference to Menlo refers to a prior corporate entity now known as XPO. See AR Tab 126 at 12576 n.1.

"were found to involve little or none of the magnitude[]of effort and complexities of the DFTS effort." Id.

For XPO, the SSEB concluded as follows:

> In all, the Government reviewed [***] past performance references for [XPO] which demonstrated a broad range of performance ratings from Marginal to Exceptional. Of the [***] references, only the DTCI effort was rated as relevant,[]the other [***] were rated as Not Relevant. The DTCI contract is considered Relevant as the effort is similar, but not essentially the same as the DFTS requirement. The scope and complexity of the DFTS solicitation differs from the scope of the DTCI contract because the DFTS solicitation is broader as it includes mode of Time Definite Delivery, three tiers of pricing, shipping into Canada and the potential of shipping into Alaska, on-ramps other federal government agencies outside of the DoD, and customs brokerage services. Furthermore, the DTCI contract is [***] percent of the average performance magnitude in dollars of the DFTS contract and [***] percent of the magnitude of shipments. Of the [***] determined Not Relevant, [***] involved some of the scope and magnitude of the effort; however, involved little or none of the complexity of the requirement. The other reference involved little of the scope and magnitude of effort and complexities of the requirement. Considering the relevancy of the references and the associated performance ratings, [XPO] has been assigned an overall Confidence Assessment Rating of **Satisfactory Confidence**.

Id. at 16611–12. Finally, the SSEB stated in its "draft comparative analysis for consideration by the Source Selection Advisory Council" that XPO's "past performance is the higher rated of the two offerors. Crowley's past performance is neither favorable nor unfavorable." Id. at 16612, 16617.

## V.   The Revised Source Selection Advisory Council Comparative Analysis

On July 18, 2017, the Source Selection Advisory Council (SSAC) issued its updated comparative analysis. Id. Tab 197 at 16970, 16983. The SSAC "reviewed the SSEB report and the underlying evaluation documents and concur[red] in their findings." Id. at 16972. The SSAC also "verified [that] the SSEB's evaluation followed the solicitation evaluation criteria and [that] the ratings were consistently applied." Id. Based upon this information, it conducted an "integrated assessment," taking into account "adjectival and risk ratings, past performance confidence assessment ratings, and the Total Evaluated Price (TEP)." Id. at 16973.

The SSAC first assessed the strengths and risks of each offeror's technical proposal in detail. Id. at 16974–80. Then, with respect to past performance, the SSAC reiterated the conclusions of the SSEB report as to both Crowley and XPO. Id. at 16980. With respect to XPO, the SSAC noted that its [***] past performance efforts "demonstrated a broad range of performance ratings from Marginal to Exceptional," but that the "Marginal ratings did not impact

[XPO's] overall confidence assessment rating because the respondent indicated [XPO] had made improvements in the areas receiving these ratings and are not considered a concern regarding future performance." Id. at 16980–81. It also noted that only "[o]ne effort was rated as Relevant." Id. at 16981.

As to price, the SSAC noted that because "the solicitation provides all rated evaluation factors (technical capability and past performance) when combined, are approximately equal to price," "price carries considerable weight in this acquisition." Id. It concluded that both the TEPs and unit prices for each offeror were "fair and reasonable based on adequate price competition" and that there was "no indication of unbalanced pricing." Id. It also found that XPO's TEP was 8.4% higher than Crowley's. Id.

The SSAC concluded that "Crowley's proposal [was] the best value to the government" because "the tradeoff of Implementation risk and Satisfactory past performance is not worth the additional Total Evaluated Price expenditure of $625M to award to [XPO]." Id. at 16973–74; see also id. at 16981 (SSAC "recommend[ing] award of the DFTS [contract] to Crowley" because the "difference of approximately $625M, or 8.4%, is disproportionate to the benefit associated with [XPO's] strengths and lower risk rating under Subfactor 2 and [XPO's] past performance confidence assessment rating of Satisfactory Confidence"). The SSAC found that "Crowley's moderate risk rating under" the second technical evaluation subfactor was not "so substantial that it cannot be overcome with special contractor emphasis and close Government monitoring." Id. at 16981. Further, it found that:

> While it is noted there is some risk associated with awarding a contract to an Offeror with a Confidence Assessment Rating of Unknown Confidence, we are willing to accept that risk. Even though Crowley was unable to provide any individual referenced effort which was considered even Somewhat Relevant, they do provide numerous smaller transportation services, making the risk of successful performance worth the $625M lower price.

Id.

Moreover, the SSAC noted that the government had "some built in mitigation factors in place to significantly reduce any risk." Id. Accordingly, the SSAC that found Crowley's proposal "avoids the Government's payment of a disproportionate price premium to [XPO] for its slightly favorable past performance rating . . . and its slightly favorable technical approach." Id. at 16982.

## VI.   The Source Selection Authority Decision

On July 20, 2017, the Source Selection Authority (SSA) issued the Source Selection Decision Document. Id. Tab 198. It contained the same analysis and conclusions as the SSAC report. See id. When describing the history of the corrective action, the SSA noted that "the Contracting Officer thought it unreasonable to evaluate one Offeror under conditions different from the other Offeror, and to reconcile this consideration, the Contracting Officer, to ensure equal treatment, decided to reevaluate both Offerors' past performance under identical conditions." Id. at 16985. The SSA then affirmed the past performance conclusions of the SSEB

and SSAC. Id. at 16989. As pertinent to XPO's protest, the SSA wrote that "[i]n all, the Government reviewed [***] past performance references which demonstrated a broad range of performance ratings from Marginal to Exceptional. One effort was rated as Relevant and the other [***] were rated as Not Relevant." Id. He also reiterated that XPO's Satisfactory Confidence assessment rating was "based on the Offeror's recent/relevant past performance record." Id.

After reviewing the solicitation's other criteria, the SSA concluded that "the Total Evaluated Price difference of $625,139,516, or 8.4%, is disproportionate to the benefit associated with [XPO's] technical strengths and lower risk rating under Subfactor 2 and [XPO's] past performance confidence assessment rating of Satisfactory Confidence." Id. at 16989–90. Thus, he wrote that "based on [his] integrated assessment of all proposals . . . it [was his] independent assessment that the proposal submitted by Crowley Logistics represents the best overall value to the Government." Id. at 16991.

## VII.   XPO's New Bid Protest

On July 24, 2017, USTRANSCOM notified both offerors that Crowley had again been selected for the contract award. Id. Tab 199 at 16992–93; id. Tab 201 at 17012. The next day, on July 25, 2017, Crowley and USTRANSCOM signed Modification Number 1 to the contract, which lifted the previous stay of performance and revised the periods of performance. Id. Tab 202 at 17030.

On August 8, 2017, XPO filed its complaint in this court. ECF No. 1. Two days later, Crowley filed a motion to intervene, which the Court granted that same day. ECF Nos. 11, 18. On September 5, 2017, XPO filed an amended complaint. ECF No. 32.

In its amended complaint, XPO asserts five causes of action: 1) that the agency engaged in misleading and unequal discussions with XPO regarding past performance; 2) that the agency made a number of errors in downgrading XPO's confidence assessment rating from Substantial to Satisfactory and that its past performance evaluation was therefore arbitrary and capricious; 3) that the agency failed to evaluate unbalanced pricing in accordance with the FAR; 4) that the agency's best value determination was arbitrary and capricious because it failed to appropriately consider the cost to the government; and 5) that the agency engaged in misleading discussions by considering price in its best value tradeoff in a manner different from its previous best value tradeoffs, and that it engaged in an irrational tradeoff analysis because it improperly relied upon Crowley's Corporate Experience. Am. Compl. ¶¶ 93–126.

As noted above, the parties have now cross-moved for judgment on the administrative record. The Court held oral argument on all pending motions on October 13, 2017. Order, ECF No. 25.

## DISCUSSION

## I.   Subject Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of

1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359–62 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). In making the standing determination, the Court assumes well-pled allegations of error in the complaint to be true. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)); see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1131–32 & n.9 (Fed. Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694–95 (2010) (noting that the showing of prejudice as an element of standing "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true," and distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

Here, the Court has subject matter jurisdiction. XPO was an actual offeror and challenges the award of a contract. It alleges, among other errors, that the agency wrongly downgraded its past performance ratings and confidence assessment. Taking XPO's allegations as true, and considering XPO's status as the incumbent on the predecessor contract and as the only other offeror besides Crowley, it has sufficiently shown that absent the errors, it had a substantial chance of securing the award. XPO is thus an interested party and the Court has jurisdiction over its bid protest.

## II.   XPO's Motion to Supplement the Administrative Record

XPO has filed a motion to supplement the administrative record with the affidavit of Keith A. Dyer, its senior vice president of managed transportation. XPO's Mot. to Suppl. the

Admin. R. at 1, ECF No. 31. According to Mr. Dyer, the purpose of his affidavit is "to explain certain aspects of the industry for the Court, to point out certain errors in USTRANSCOM's Round 3 past performance evaluation of XPO that may not be obvious or are difficult to compute from the record, to explain how XPO could have addressed perceived deficiencies and improved its score if it had been given the opportunity through discussions, and to explain how XPO would be injured if it is unfairly denied award of the DFTS contract." Dyer Aff. ¶ 3, ECF No. 31-2. The government and Crowley oppose XPO's motion. ECF Nos. 34, 37.

It is well established that in a bid protest case the Court of Federal Claims is to "apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents" to it. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (emphasis in original). Therefore, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Id. (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). This limitation guards against the possibility that the court's scope of review will be transformed from an examination of the reasonableness of the agency's determination under APA standards "into effectively de novo review." Id. at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)). In light of these principles, the court of appeals has held that in bid protests, "supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." Id. (quotation omitted).

Here, an examination of the assertions in Mr. Dyer's affidavit shows that it does not fall within that limited category of cases in which supplementation of the administrative record is appropriate. First, paragraphs one through seven of the affidavit merely include identifying information and a summary of the administrative record. Paragraphs eight through fifteen consist of Mr. Dyer's critique of the methodology the agency used to compare the value of the [***] and [***] contracts to the value of the DFTS contract. Specifically, he argues that the agency should have considered the value of the freight XPO handled under those contracts in addition to the value of the logistics management services it provided. Mr. Dyer, however, is not an independent expert; he is the XPO officer responsible for preparing its proposals. In any event, his views on how the agency should have evaluated the proposal he helped prepare are not necessary for meaningful review of the agency's decision; rather, they represent an invitation for the Court to substitute Mr. Dyer's less-than-impartial views for the judgment of the agency.

Similarly, in paragraphs eighteen through twenty-five, Mr. Dyer expresses his objections to and disagreements with the agency's conclusions regarding the differences in complexity between the DFTS and DTCI contracts and the significance of those differences. XPO's effort to supplement the record with such material again ignores that the Court's job is not to determine de novo which past performance efforts were relevant and which were not, but rather to review the reasonableness of the agency's determination based on the administrative record before it.

In paragraphs sixteen, seventeen, and twenty-six, Mr. Dyer attempts to identify the type of information XPO would have provided to the agency if the agency had held discussions with the offerors when conducting its reevaluation as part of the corrective action. These paragraphs are irrelevant and not necessary for the Court to engage in meaningful review, given the Court's conclusion, infra, that the agency was not required to hold additional discussions.

Finally, paragraph twenty-seven of the affidavit identifies what Mr. Dyer characterizes as the irreparable harm XPO will suffer if it does not receive the contract award. These harms include an unspecified amount of lost profits and the layoff of approximately twenty-five employees. While it may sometimes be necessary to supplement the record with evidence concerning irreparable harm, in this case Mr. Dyer's observations are not necessary for the Court to address irreparable harm because, as discussed below, XPO has not succeeded on the merits of its claims. Even if it had, the loss of employees, in and of itself, does not constitute irreparable harm, and the fact that XPO would not earn profits from the contract if the award to Crowley stands is self-evident.

Accordingly, XPO's motion to supplement the administrative record is **DENIED**.

## III.    Standard of Review

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

In a bid protest, the Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court

should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). A disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni, 238 F.3d at 1338.

## IV.    XPO's Allegations of Misleading and Unequal Discussions Regarding Past Performance

In Count I of its amended complaint, XPO alleges that the agency engaged in misleading and unequal discussions. Am. Compl. ¶¶ 93–97. Specifically, according to XPO, prior to the recent corrective action, "XPO's past performance proposal remained unchanged, and the agency provided XPO one, consistent message regarding its past performance: XPO's references (at least [***] of [***]) were recent, Very Relevant and Relevant, and supported the agency's unwavering Substantial Confidence rating." XPO's Br. at 4; see also id. at 5 (citing AR Tab 62) (noting that the agency informed XPO during initial discussions in August 2015 that XPO's "past performance proposal had been assessed the highest possible rating under the past performance factor" and that "the agency did not provide XPO with any evaluation notices ('ENs') or otherwise address XPO's past performance proposal"). Notwithstanding those assurances, XPO complains, "in its most recent reevaluation undertaken without reopening discussions, the agency abruptly changed course and . . . downgraded XPO's past performance evaluation, . . . assessing a reduced Satisfactory Confidence rating." Id. at 4. It argues that this "changed evaluation," which USTRANSCOM conducted "without reopening discussions or providing the offerors an opportunity to revise their proposals . . . . rendered [the agency's earlier] discussions with XPO misleading." Id. at 8.

As noted, XPO also contends that the agency engaged in unequal treatment. Specifically, XPO notes that because the agency did not conduct discussions in connection with the most recent corrective action, XPO did not have the opportunity to address USTRANSCOM's concerns about its past performance or to improve its proposal. By contrast, XPO observes that prior to the previous evaluations "[t]he agency repeatedly informed Crowley that its references were Not Relevant, resulting in a rating of Unknown Confidence/Neutral[,] and issued Crowley at least one EN related to past performance"; moreover, the agency allowed Crowley to take "advantage of those opportunities to make multiple proposal revisions in an attempt to improve this area of its proposal." Id. at 9.

As discussed below, under Federal Circuit precedent, XPO has waived its misleading and unequal discussions claims by failing to raise them when the agency announced its corrective action plan. Further, even if the claims were not waived, they lack merit.

### A.    XPO's Waiver of Misleading and Unequal Discussions Claims

XPO's argument that the agency should have held discussions as part of the corrective action is barred by the doctrine of waiver set forth in Blue & Gold Fleet, LP v. United States, 492 F.3d 1308, 1313–15 (Fed. Cir. 2007). In that case, the court of appeals held that a party that is aware of an error in the solicitation may not wait until after the government selects another contractor to challenge that error. See id. at 1313.

Here, it is beyond dispute that XPO has been on notice since before XPO I was litigated that its past performance ratings would likely change upon reevaluation and that the agency did not intend to hold discussions as part of any corrective action. First, at XPO's own urging, GAO opined that past contracts whose values were less than 10% of the properly calculated average annual value of the DFTS contract should presumptively be considered Not Relevant. See AR Tab 148 at 13016. In light of GAO's decision, XPO should have known that if and when the agency took corrective action, the two XPO past performance references that the agency had previously identified as Somewhat Relevant would be vulnerable to being downgraded to Not Relevant based solely on their lack of comparable magnitude. In fact, the administrative record in XPO I contained an internal agency email from the contracting officer in which he stated that "[w]e will re-evaluate past performance for both Offerors utilizing what GAO considers a reasonable benchmark" and that "we have already discovered this new benchmark will effect [sic] both Offerors' Confidence Assessment Ratings." Id. Tab 175 at 15859.

Further, the email also stated that "[i]t is determined unnecessary to . . . re-open discussions as the evaluation criteria meets the requirement needs, no weaknesses or deficiencies remain, discussions were held fairly, and each Offeror[']s total evaluated price is indicative of the benefit each Offeror provides." Id. And, on July 3, 2017, just after the Court issued its decision in the prior protest, but before the completion of the corrective action, XPO was directly advised that no discussions would take place during the reevaluation. Id. Tab 194 at 16556–58.

Notwithstanding the foregoing, XPO did not protest the agency's decision not to hold discussions until after USTRANSCOM again awarded the contract to Crowley. Accordingly, XPO has waived its misleading and unequal discussions arguments. See Blue & Gold Fleet, LP, 492 F.3d at 1313 (noting that the "proper procedure [is] for the offeror . . . not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion," and that "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm" (internal quotations and alteration omitted)).

## B.     The Merits of XPO's Misleading and Unequal Discussions Claims

In any event, even assuming that XPO did not waive its misleading and unequal discussions arguments, those arguments lack merit. "[M]isleading discussions are characterized by communications from the government that are incorrect, confusing or ambiguous." DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 670 (2010). The requirement that discussions be meaningful and not misleading means that an agency must not "misdirect the protestor as it revises its proposal." Greenland Contractors I/S v. United States, 131 Fed. Cl. 216, 225 (2017) (quoting DMS All-Star Joint Venture, 90 Fed. Cl. at 670) (alteration omitted); see also Caddell Constr. Co. v. United States, 125 Fed. Cl. 30, 45 (2016) ("An error in communicating a weakness that causes an offeror to revise its proposal is quintessentially a misleading discussion.").

As noted above, during the two rounds of discussions that preceded the previous two evaluations, the agency advised XPO that it intended to assign XPO a Substantial Confidence rating and, in fact, it did so. Thus, XPO does not argue that the information regarding its past performance efforts that the agency provided to it was incorrect, confusing, or ambiguous when

it was relayed to XPO during the discussions that accompanied the first and second rounds of the evaluation process. Instead, it contends that the agency somehow rendered the past discussions misleading on a retroactive basis when it later took corrective action and assigned a lower confidence rating to XPO based on a reevaluation that XPO itself had urged.

This argument—elements of which bring to mind the plot of the motion picture "Back to the Future"—is illogical and unpersuasive. XPO could not have been misled by the agency's assurances regarding its initial two Substantial Confidence ratings either at the time of the discussions (preceding the first and second evaluations) or later when USTRANSCOM announced that it was going to take corrective action. At the time of the discussions, as explained above, the information imparted to XPO was accurate. And when the agency announced and then initiated corrective action, XPO could not have been misled by those prior discussions into believing that the agency's earlier assessments would remain the same after the reevaluation. In fact, as described above, XPO had every reason to expect that its past performance rating would be adversely affected by the corrective action.

The decisions in Raytheon Co. v. United States, 121 Fed. Cl. 135, 142–44, aff'd, 809 F.3d 590 (Fed. Cir. 2015) and AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 358, 372–73 (2009), upon which XPO relies, are inapposite. In those cases, during discussions the agencies led at least some of the offerors to believe that their proposals would be evaluated based on a particular methodology and those offerors revised their proposals or otherwise proceeded accordingly. The agencies then applied different methodologies without ever notifying those offerors of the change. In this case, by contrast, XPO was never misinformed about how it would be evaluated at any stage. And, the discussions that took place in connection with stages one and two of the evaluation process did not somehow become misleading at the final stage.

For similar reasons, there is no merit to XPO's argument that it was subjected to unequal treatment. Unequal discussions are those which prejudicially favor one offeror over another, such as where an agency provides one offeror a "crucial" or "advantageous" piece of information during discussions, but does not provide the same to another offeror. DMS All-Star Joint Venture, 90 Fed. Cl. at 672. In this case, the offerors were treated equally during each evaluation round. In the earlier rounds, each was afforded the opportunity to engage in discussions and each was accurately informed of the agency's tentative view of its past performance. Further, the offerors also received equal treatment during the most recent round of evaluations, pursuant to the corrective action, because the agency neither held discussions with either party nor accepted proposal revisions.

Accordingly, based upon the foregoing, XPO's motion for judgment on the administrative record as to Count I is **DENIED** and Crowley's and the government's cross-motions are **GRANTED**.

## V.      XPO's Challenges to the Agency's Past Performance Reevaluation

### A.      USTRANSCOM's Evaluation of XPO's [***] and [***] Contracts

In Count II of its amended complaint, XPO challenges the agency's reevaluation of the relevance of its past contracts with [***] and [***]. It contends that when comparing the

magnitude of those contracts to the magnitude of the DFTS contract, the agency "did not do an apples-to-apples comparison" because, although the value assigned to the DFTS contract was based on "freight under management" (FUM), the agency did not use FUM as a measure of the value of the [***] and [***] contracts. XPO's Br. at 12–13; see also id. at 13–14. This contention lacks merit.

First, consistent with the solicitation, USTRANSCOM did not prescribe any particular methodology for offerors to use when identifying the value of their past performance references. During the evaluation process, it assigned dollar values to offerors' past performance efforts on the basis of the values the offerors themselves set forth in their proposals, and as reflected in the past performance references the offerors submitted. Thus, in its proposal, XPO stated that the [***] contract value was [***] for its five-year term, which translates to an approximate annual value slightly less than [***]. See AR Tab 207 at 17172–73. And when [***] responded to agency questions as part of the agency's efforts to validate the past performance reference, it similarly informed USTRANSCOM that the annual contract value was [***]. Id. Tab 187 at 16326. The agency, relying on these values, concluded that the "annual total contract value" of XPO's past contract with [***] was [***]. Id. Tab 192 at 16354.

Similarly, XPO asserted in its proposal that the [***] contract value was "~[***]" over a nine-year term. Id. Tab 207 at 17172–75. [***] reported to USTRANSCOM more specifically an annual value of [***]. Id. Tab 188 at 16329. The agency then assigned the contract an annual value of [***]. Id. Tab 192 at 16354. The agency's valuation of XPO's past efforts involving [***] and [***] is thus supported by XPO's own representations reflected in the record.

Moreover, XPO's argument that the agency considered FUM in the earlier evaluations but ignored it during the corrective action has no support in the record. The values the agency assigned to the [***] and [***] contracts during the corrective action match those assigned by the agency in the two previous evaluation rounds. See id. Tab 115 at 12270–71 (concluding that the [***] contract had an approximate total value of [***] and that the [***] contract had an annual value of [***]). And, there is no mention of "freight under management" anywhere in the solicitation or in the previous rounds' evaluations. See id.[9]

Finally, and in any event, XPO was not prejudiced by the alleged error regarding the valuation of its past performance references. See Bannum, Inc., 404 F.3d at 1353 (in order to prevail in a bid protest, the protester must "establish 'significant prejudice'" by showing there was a substantial chance it would have received the contract absent the error the court has found). In determining that the [***] and [***] contracts were Not Relevant, the agency relied primarily upon their lack of comparable complexity, not their magnitude, noting that they "involve[d] little or none [of the] complexities [of the DFTS contract] and [were] therefore rated as **Not Relevant**." AR Tab 192 at 16354–55 (emphasis in original) (observing that the [***] reference provided no evidence of XPO's capabilities with respect to "on time pick-up of freight, on time delivery of freight, and availability of equipment, to include specialized equipment," and

---

[9] To the extent XPO is contending that the solicitation should have required the agency to consider FUM in assessing the magnitude of past efforts, that argument is a challenge to the terms of the solicitation and is untimely. See Blue & Gold Fleet, LP, 492 F.3d at 1314–15.

that the [***] reference "demonstrated little or none of the complexities of the DFTS effort"). XPO accordingly has not demonstrated a substantial chance of obtaining the award absent the error it alleges.[10]

## B.   **USTRANSCOM's Evaluation of XPO's DTCI Contract**

XPO also challenges the agency's decision to assign the DTCI contract a "Relevant" rating rather than the "Very Relevant" rating it received in the first two evaluation rounds. It argues that "[w]hile there are minor differences . . . in the DFTS program, [DFTS and DTCI] are essentially the same in size, scope, and complexities." XPO's Br. at 17–18.

Determining that a past performance reference involved "similar" as opposed to "essentially the same" scope and magnitude of effort and complexities involves an exercise in judgment that is best left to the expertise and discretion of the agency. Therefore, as noted above, the Court's review is limited to ascertaining whether the agency "provided a coherent and reasonable explanation of its exercise of discretion." Impresa Construzioni, 238 F.3d at 1332.

In this case, the determination that the DTCI and the DFTS contracts were not essentially the same in terms of scope and complexity was based on several differences between the two efforts that the agency identified. First, the DFTS contract (but not the DTCI contract) provides a shipping agency with the option of selecting a "Time Definite Delivery." AR Tab 20 at 9538. When this option is selected, shipment must occur "with delivery constraints less than the standard transit time which require the Contractor to determine the appropriate level of service." Id.

XPO observes that air delivery is the mode of transport that will generally be used for time-definite deliveries under this requirement of the DFTS contract, and implies that it similarly provided air freight services under the DTCI contract. XPO's Br. at 19–20; see also XPO's Reply in Supp. of Its Mot. for J. on the Admin. R. & Opp'n to the Gov't's and Crowley's Cross-Mots. at 17, ECF No. 39 (claiming that between March 2008 and July 2013, the DTCI contract provided for air freight services). But the version of the DTCI contract found in the record (dated August 17, 2007), which appears to be the version of the DTCI contract submitted by XPO and found recent by USTRANSCOM, expressly excluded such services. See AR Tab 181 at 16037, 16132–33, 16140. The agency was therefore entitled to find that the two efforts were similar, but not essentially the same. See id. Tab 20 at 9501.

Second, the agency reasonably concluded that the DFTS contract and the DTCI contract are not essentially the same because the DFTS contract contains three pricing tiers that are based on three possible response/pick-up times: a tier based on a four-hour response/eight-hour pick-up time, a tier based on a twelve-hour response/twenty-four-hour pick-up time, and a tier based on a twenty-four-hour response/forty-eight-hour pick-up time. Id. Tab 20A; see also id. Tab 5 at 73.

---

[10] For this same reason, XPO was not prejudiced by another error it alleges—that the agency miscalculated the DFTS average annual value against which past efforts were measured. XPO's Br. at 23–25; see also n.3, supra. As noted, the relevancy ratings for the [***] and [***] contracts were based primarily upon differences in complexity and scope, not magnitude.

The DTCI contract, on the other hand, provides only [***]. Id. Tab 181 at 16143, 16174; see also id. Tab 5 at 73; id. Tab 22 at 10122 (agency stating during DFTS solicitation question and answer opportunity that "[t]he three tier pricing option is new to this requirement").[11]

The agency also noted that the DFTS requirement for shipping into Canada, and potentially Alaska, differed from the DTCI contract, which involves shipping only within the continental United States. XPO argues that shipping into Canada and Alaska is only a small part of the contract and that it will involve the same transportation services that XPO provides under DTCI in the continental United States. Notwithstanding these arguments, providing for shipping services in Canada certainly adds an additional level of complexity into the contract, as such services will be subject to different laws than those in the United States and may require a border crossing. The agency acted within its discretion when it identified shipping outside the continental United States under the DFTS but not the DCTI contract as another material difference between the two contracts.[12]

Finally, the agency concluded that DFTS is not essentially the same as DTCI because the former "on-ramps other federal government agencies outside of the DoD." Id. Tab 192 at 16353; see also id. Tab 196 at 16611–12. According to XPO, this distinction "is something that only potentially may happen"; further, it observes that "XPO held extensive, serious discussions with USTRANSCOM and GSA about folding GSA into the DTCI program." XPO's Br. at 21. The fact remains, however, that under the DFTS program the contractor may be required to on-ramp additional agencies and that XPO never actually performed that service under DTCI. See AR Tab 20 at 9521; see also id. Tab 5 at 73 (noting that DTCI does not have an "On-Ramp[] for others to join," while DFTS does). Thus this distinction is also supported by the record.

In short, the record provides support for each of the scope and complexity distinctions that USTRANSCOM drew between the DTCI contract and the DFTS contract. For that reason, the Court concludes that the agency acted within its discretion when it determined that the scope and complexities of the DTCI contract were "similar to" but not "essentially the same" as the DFTS contract.

---

[11] XPO calls this a "false distinction" because "DTCI also has rate applications dependent upon many criteria." XPO's Br. at 20. But the fact that both contracts include rates that depend on multiple criteria does not speak to the distinction the agency identified, which concerns the existence of multiple response/pick-up time options.

[12] Similarly, XPO quarrels with the significance the agency gave to the fact that the DFTS contract requires customs brokerage services, although it admits that the DFTS requirement to provide such services is a valid distinction. XPO's Br. at 21. The agency, however, acted within its discretion in finding that this undisputed difference between the programs contributed to its conclusion that the contracts were not essentially the same.

### C.   USTRANSCOM's Alleged Consideration of XPO's Not Relevant Past Performance References

XPO also contends that when assigning it a confidence rating of Satisfactory rather than Substantial, the agency improperly considered certain marginal quality ratings contained in past performance references that it had determined Not Relevant. XPO's Br. at 26–30. XPO bases its argument on a passage in the SSA's decision that reads as follows:

> [XPO's] proposal under the Past Performance evaluation factor received a Past Performance Confidence Assessment rating of Satisfactory Confidence meaning, based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. In all, the Government reviewed [***] past performance references which demonstrated a broad range of performance ratings from Marginal to Exceptional. One effort was rated as Relevant and the other [***] were rated as Not Relevant.

AR Tab 198 at 16989.

While XPO focuses on the summary description of XPO's past performance references contained in the second and third sentences of this passage, it ignores the topic sentence, which explicitly states that XPO's Satisfactory Confidence assessment rating was "based on the Offeror's recent/relevant past performance record." Id. (emphasis added). Moreover, the SSEB and SSAC reports, upon which the SSA explicitly relied and with which he concurred, each reflect that their Satisfactory Confidence ratings were based solely on XPO's one Relevant effort, the DTCI contract. See id. Tab 196 at 16611–12; id. Tab 197 at 16980–81 (also concluding that XPO's Satisfactory Confidence rating was "based on the Offeror's recent/relevant performance record"). Accordingly, when read as a whole, the record does not support XPO's contention that the SSA relied upon quality ratings from XPO's non-relevant past performance efforts in assigning XPO a Satisfactory Confidence rating.[13]

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

For all of the foregoing reasons, XPO's motion for judgment on the administrative record as to Count II is **DENIED** and the government's and Crowley's cross-motions as to that count are **GRANTED**.

## VI.   XPO's Challenge to the Agency's Best Value Tradeoff

Finally, XPO claims that in conducting its best value tradeoff analysis, the agency improperly considered past performance efforts by Crowley that the agency had found Not Relevant. Am. Compl. ¶ 125; see also XPO's Br. at 30. Specifically, XPO cites the following

---

[13] In light of this conclusion, the Court will not address XPO's alternative argument that if it was appropriate for the SSA to consider irrelevant quality ratings, it failed to properly consider the mitigation surrounding XPO's marginal ratings. See XPO's Br. at 30–34.

passage in the SSA's decision, addressing the risk posed to the agency by Crowley's Unknown Confidence assessment:

> While it is noted there is some risk associated with awarding a contract to an Offeror with a Confidence Assessment rating of Unknown Confidence, I am willing to accept that risk. Because, even though Crowley was unable to provide any individual referenced effort which was considered Somewhat Relevant, it provided numerous smaller transportation services, making the risk of successful performance worth the $625M lower price.

AR Tab 198 at 16990.

Notwithstanding XPO's argument, there was nothing improper about the SSA considering the "numerous smaller transportation services" Crowley had provided in conducting its best value tradeoff. While those services were irrelevant in assessing Crowley's Past Performance, they nonetheless bear on a separate factor appropriately considered in making the tradeoff decision—Crowley's Corporate Experience.[14] As GAO has recognized, "[g]enerally, an agency's evaluation under an experience factor is distinct from its evaluation of an offeror's past performance." See, e.g., Shaw-Parsons Infrastructure Recovery Consultants, LLC, B-401679.4 et al., 2010 WL 1180085, at *11 (Comp. Gen. Mar. 10, 2010).[15] Where an agency includes separate experience and past performance factors, the "former focuses on the degree to which an offeror has actually performed similar work, whereas the latter focuses on the quality of the work." CSI, Inc., B-407332.5 et al., 2015 WL 468260, at *4 n.3 (Comp. Gen. Jan. 12, 2015).

Here, the agency was required under the solicitation to consider both the Corporate Experience and Past Performance factors in making its best value decision. See AR Tab 20 at 9494. Thus, the solicitation stated that "[t]o receive award, the offeror must . . . (3) represent a best value to the Government, price and other factors considered." Id. It also provided that "[e]ach offeror's proposal will be evaluated against the following criteria: a. Corporate Experience . . . d. Past Performance . . . ." Id.

---

[14] Under the solicitation, offerors were to submit separate Corporate Experience and Past Performance volumes which were subject to separate evaluation criteria. AR Tab 20 at 9494. For Corporate Experience, the solicitation required offerors to "submit recent and relevant corporate experience related to the tasks described within the [Performance Work Statement]." Id. at 9485. Specifically, the agency sought prior contracts relevant to three specific sub-tasks: 1) carrier management; 2) operational support; and 3) interfaces and data exchanges with government systems. Id. at 9486.

[15] Although GAO opinions are not binding on the Court of Federal Claims, the Court "may draw on GAO's opinions for its application of [its] expertise." See Allied Tech. Grp., Inc. v. United States, 649 F.3d. 1320, 1331 n.1 (Fed. Cir. 2011); see also Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 503 (2005) (noting that GAO decisions are not binding on the court but "are persuasive").

In short, based on the plain language of the solicitation, the agency was permitted to consider Corporate Experience in its tradeoff analysis. Therefore, when the SSA weighed the experience Crowley possessed on the basis of its smaller efforts against the risks of its Unknown Confidence rating he was acting consistent with the solicitation.

## VII.  XPO's Claims Regarding Unbalanced Pricing and the Agency's Consideration of Price

With the exception of its claim that the agency improperly considered past performance efforts by Crowley that the agency had found Not Relevant, which is made at the end of Count V, XPO makes the same claims and relies upon the same legal arguments in Counts III, IV, and V of its amended complaint that it pursued in its previous protest: namely, that the agency "did not consider Crowley's unbalanced pricing and improperly considered only the TEP in the price tradeoff." XPO's Br. at 38; see also Am. Compl. ¶ 3; compare Am. Compl. ¶¶ 104–126, with Am. Compl. ¶¶ 69–74, 83–89, 101–108, XPO I, No. 17-452 (Fed. Cl. Apr. 10, 2017), ECF No. 28. The Court rejected those claims on their merits in XPO I. See 133 Fed. Cl. at 180–84. "Under the doctrine of claim preclusion [or res judicata], 'a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.'" Acumed LLC v. Stryker Corp., 525 F.3d 1319, 1323 (Fed. Cir. 2008) (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n.5 (1979)) (footnote omitted). Accordingly, XPO's motion for judgment on the administrative record as to Counts III, IV, and V are **DENIED** and the government's and Crowley's cross-motions as to those counts are **GRANTED**.

## CONCLUSION

Based on the foregoing, XPO's motion to supplement the administrative record is **DENIED**. Its motion for judgment on the administrative record is **DENIED** and the government's and Crowley's motions for judgment on the administrative record are **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**


s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge